Index No. 16 Civ. 08719 (AJN)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

HENRY CAMPBELL, et al.,

Plaintiffs,

-against-

CITY OF NEW YORK,

Defendant.

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR DECERTIFICATION

**ZACHARY W. CARTER**
Corporation Counsel of the City of New York
Attorneys for Defendant
100 Church Street - Room 2-139/2-188
New York, NY 10007

Of Counsel:
Kerrin A. Bowers
J. Kevin Shaffer
Tel: (212) 356-2473/1105
Matter No. 2016-048230

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 2

    I.       DHS POLICE ............................................................................................ 2

    II.     THE CITY'S TIME AND ATTENDANCE POLICIES AND PRACTICES ........ 3

         A.   The CityTime System ................................................................. 3

         B.   Plaintiffs' Work Schedules ......................................................... 4

         C.   Overtime Procedure and Payments to Plaintiffs ............................ 6

    III.    PLAINTIFFS' PRE-SHIFT, POST-SHIFT AND MEAL PERIOD CLAIMS ARE
        BASED UPON HIGHLY INDIVIDUALIZED CIRCUMSTANCES ................. 7

         A.   Meal Period Claims ................................................................... 8

         B.   Pre-Shift and Post-Shift Claims ................................................ 11

    IV.    PLAINTIFFS' CLAIMS ARE BASED UPON THE INDIVIDUAL PRACTICES
        OF THEIR SUPERVISING SPECIAL OFFICERS, MANY OF WHOM ARE ALSO
        PLAINTIFFS IN THIS ACTION ................................................................ 14

ARGUMENT ..................................................................................................... 15

    THE COLLECTIVE SHOULD BE DECERTIFIED ...................................... 15

         A.   Applicable Legal Standard ........................................................ 15

         B.   Plaintiffs' Claims Are Predicated On Their Own
            Individual Circumstances ........................................................... 17

              1.   Officers are not Similarly Situated to Sergeants ................ 17

              2.   Plaintiffs' Claims are Dependent upon
                  Individualized Factors such as their Particular
                  Supervisors, Posts and Assignments, Facilities, and
                  Personal Customs and Preferences .......................... 20

              3.   Plaintiffs' Claims are Subject to Individualized
                  Defenses .................................................................. 24

CONCLUSION .................................................................................................. 26

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*DeSilva v. N. Shore-Long Island Jewish Health System*,
   27 F. Supp. 3d 313 (E.D.N.Y. 2014) ......................................................................................21

*Diaz v. Elecs. Boutique of Am., Inc.*,
   2005 U.S. Dist. LEXIS 30382 (W.D.N.Y. 2005) ...................................................................16

*Gordon v. Kaleida Health*,
   299 F.R.D. 380 (W.D.N.Y. 2014)..........................................................................................20

*Kuebel v. Black & Decker, Inc.*,
   643 F.3d 352,365 (2d Cir. 2011).....................................................................................20, 24

*Morano v. Intercontinental Capital Grp., Inc.*,
   2012 U.S. Dist. LEXIS 100830 (S.D.N.Y. 2012) ..................................................................21

*Myers v. Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010)............................................................................................15, 16

*Ruiz v. Citibank, N.A.*,
   93 F. Supp. 3d 279 (S.D.N.Y. 2015)......................................................................................21

*Seward v. IBM*,
   2012 U.S. Dist. LEXIS 49688 (S.D.N.Y. 2012).....................................................16, 17, 21, 22

*Thind v. Healthfirst Mgmt. Servs., LLC*,
   2016 U.S. Dist. LEXIS 170503 (S.D.N.Y. 2016) ..................................................................21

*Trinidad v. Pret A Manger*,
   962 F. Supp. 2d 545 (S.D.N.Y. 2013).....................................................................................16

*Zavala v. Wal-Mart Stores Inc.*,
   691 F.3d 527 (3d Cir. 2012).........................................................................16, 17, 21, 24

*Zivali v. AT&T Mobility, LLC*,
   784 F. Supp. 2d 456 (S.D.N.Y. 2011)....................................................16, 17, 20, 21, 22, 25

**Statutes**

29 U.S.C. §§ 201 et seq. ("FLSA")............................................................1, 2, 15, 16, 17, 20, 24

## PRELIMINARY STATEMENT

Plaintiffs are 494 current or former Special Officers ("Officers") or Supervising Special Officers, Level I ("Sergeants") who worked at the City of New York's ("City" or "Defendant") Department of Homeless Services ("DHS") at some point since November 10, 2013.  Plaintiffs allege that they are entitled to damages under the Fair Labor Standards Act, 29 U.S.C. § 201, *et seq*. ("FLSA") because they were not compensated for time allegedly worked, but not reported to DHS, in excess of their regular shifts ("Off The Clock Claim").  Plaintiffs further allege that the City improperly calculated the regular rate of pay ("Regular Rate Claim"), overtime compensation was not paid to them in a timely manner ("Timeliness Claim"), and they were improperly paid straight time for compensatory time, instead of at a premium rate ("Straight Time Claim").  Plaintiffs' Off the Clock Claim was conditionally certified as a collective on July 25, 2017; conditional certification was denied as to the remaining three claims.[1]  *See* ECF No. 37.  As such, this motion addresses decertification of the collective with respect to Plaintiffs' Off-the-Clock Claim only.

The continued certification of this claim is not appropriate, and it should be decertified. Plaintiffs serve as either Officers or Sergeants within DHS.  Officers are not similarly situated to Sergeants given the vast differences in their responsibilities.  Critically, Sergeants supervise Officers and, as part of their supervisory duties, review and approve Officers' timesheets and overtime requests.  Currently, there are Plaintiffs in this action that have served, or currently serve, as supervisors for other Plaintiffs.  This fundamental difference alone precludes certification.

---

[1] Plaintiffs Jessica Maniotis and Edwin Rosario allege the Regular Rate Claim, Plaintiff Henry Campbell alleges the Timeliness Claim, and Plaintiffs Jermaine Abraham and Edwin Rosario allege the Straight Time Claim.

In addition, Plaintiffs' claims are based upon their individual employment circumstances, such as their particular supervisors, posts and assignments, facilities, and personal customs and preferences. These varying experiences lead to vast differences in their alleged claims. This is particularly evident with respect to Plaintiffs' Off the Clock claims, which hinge entirely on Plaintiffs being able to prove that an individual supervisor personally witnessed a particular Plaintiff engage in uncompensated work. This type of highly particularized theory of liability is not amenable to collective treatment. Lastly, Plaintiffs' claims are subject to differing defenses. As such, this matter cannot be maintained as a collective.

## FACTUAL BACKGROUND

Plaintiffs are 494 current or former Officers and Sergeants employed by DHS, who allege that the City failed to pay overtime wages in accordance with the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. ("FLSA"), for work performed before their scheduled hours, after their scheduled hours, and during their scheduled meal periods.

### I.   DHS POLICE

DHS maintains its own, internal group of peace officers who are responsible for securing DHS facilities throughout the City of New York. Officers are responsible for patrolling DHS facilities; screening employees and visitors; effectuating arrests and issuing summonses; transporting or escorting persons in custody to NYPD precincts; assisting sick, injured, disabled, and emotionally disturbed persons ("EDPs"); preparing relevant paperwork related to arrests, summonses, EDPs; and numerous other duties related to maintaining the safety and order of DHS facilities. *See* Officer Title Spec., Ex. A; Officer Master T&S, Ex. B annexed to the

Declaration of J. Kevin Shaffer, dated April 15, 2019, ("Shaffer Decl.").[2]  Officers are directly supervised by Sergeants.  *See* Sergeant Title Spec., Ex. C; Sergeant Master T&S, Ex. D.

As part of their supervisory duties, Sergeants are the first-line approvers of Officers' timesheets and overtime requests.  *See* Sergeant Master T&S, Ex. D at 2; Officer Guide, Ex. E at § 107-04; OT Policy, Ex. F at 3; Code of Conduct, Ex. G at 14-15.  Sergeants are also responsible for enforcing City and DHS policies regarding the allocation and control of overtime worked by Officers; as well as monitoring Officers' schedules, time and leave, and attendance. *Id.*  Additionally, Sergeants direct security units on specific tours of duty, and in addition to performing the tasks of a Sergeant, are responsible for: supervising and evaluating job performance of Officers; coordinating Officers' assignments and equipment; directing and training Officers' in their duties and responsibilities; reprimanding and disciplining Officers for poor performance; conducting roll call; inspecting Officers' uniforms, posts, and work areas; supervising Officers handling serious and unusual incidents; interpreting and enforcing policy directives from higher supervisors; preparing and maintaining records, logs, and reports regarding patrols, demonstrations, arrests, and other incidents related to safety and security; and numerous other duties related to maintaining the safety and order of DHS facilities.  *See* Sergeant Master T&S, Ex. D; Sergeant Title Spec, Ex. C.

## II.    THE CITY'S TIME AND ATTENDANCE POLICIES AND PRACTICES

### A.    THE CITYTIME SYSTEM

CityTime is the City's proprietary web-based timekeeping and payroll system that the vast majority of City employees use to record their attendance at work, any work performed in excess of their tour and any leave taken so that they can be paid accurately.  *See* Pestana 30(b)(6)

---

[2] Unless otherwise indicated, references to "Ex." are to the exhibits which are annexed to the Shaffer Decl., submitted in support of the City's Motion for Decertification.

Tr., Ex. H at 115:9-116:2; *see* August 22 Wright 30(b)(6) Tr., Ex. I at 224:23-225:4, 238:17-20.

All Plaintiffs use CityTime to record their attendance and have done so since approximately June

2010.  *See* August 22 Wright 30(b)(6) Tr., Ex. I at 25:22-26:18.  The default in the CityTime

system is that Plaintiffs are compensated for all hours worked during their scheduled shift ("pay-

to-schedule").  *See* Pestana 30(b)(6) Tr., Ex. H at 104:15-105:11.

Employees can record their arrival and departure time in CityTime in different ways;

these arrival and departure times are often referred to as "punches."  Plaintiffs assigned to work

at DHS facilities typically use hand scanners to scan in upon arriving at work and when leaving

the facility at the end of the day.  *See* August 22 Wright 30(b)(6) Tr., Ex. I at 29:13-23; Pestana

30(b)(6) Tr., Ex. H at 194:11-23.  As an alternative to the hand scanner, employees can also

record their time by Web Clock on designated computers located within DHS facilities.  *See*

August 22 Wright 30(b)(6) Tr., Ex. I at 29:17-23, 79:25-80:19; Pestana 30(b)(6) Tr., Ex. H at

118:2-15.  Finally, Plaintiffs who report to shelters that are not directly run by DHS can

manually enter their time via time punch requests in CityTime.  *See* August 22 Wright (30(b)(6)

Tr., Ex. I at 79:25-80:19; Pestana 30(b)(6) Tr., Ex. H at 118:16-119:19.

### B.    PLAINTIFFS' WORK SCHEDULES

Plaintiffs are scheduled to work in 8.5 hour shifts.  *See* Adams 30(b)(6) Tr., Ex. K at 191-

192; *see* August 23 Wright 30(b)(6) Tr., Ex. J at 374-375.  Plaintiffs are scheduled and paid to

arrive 30 minutes before commencing their regular security duties, in order to allow for

sufficient time to change into uniform, prepare for shifts, and attend roll call.  *See* Adams

30(b)(6) Tr., Ex. K at 188-189.  Plaintiffs are afforded a five minute grace period to clock in

before they are considered late.  *See* August 22 Wright 30(b)(6) Tr., Ex. I at 54; Absence Control

& Lateness Policy, Ex. L at 8.  Roll call is held 15 minutes after Plaintiffs' shifts begin and 15

minutes prior to when Plaintiffs commencing their regular duties.  *See* Abraham Tr., Ex. M at

77:15-20; J. Johnson Tr., Ex. N at 56:5-57:8; Maniotis Tr., Ex. O at 15:24-16:13; McCraw Tr., Ex. P at 129:3-11; Rosario Tr., Ex. Q at 43:18-44:1; A. Vasquez Tr., Ex. R at 97:14-19.  By way of example, an Officer scheduled to work an 8:00 a.m. to 5:30 p.m. shift, arrives to work at 8:00 a.m. and has until 8:15 a.m. to change in to his or her uniform or otherwise prepare for his/her shift and/or roll call.  Roll call, in this example, would begin at 8:15 a.m. and the Officer would then proceed to his/her assigned duties following roll call.  The DHS Code of Conduct prohibits employees from reporting to DHS premises before their scheduled hours or remaining on DHS premises after their scheduled hours unless employees receive explicit permission to do so.  *See* Code of Conduct, Ex. G at 14, ¶ 5.7.

The DHS Peace Officer Guide provides that all Plaintiffs are to take a daily half-hour unpaid meal break.  *See* August 23 Wright 30(b)(6) Tr., Ex. J at 374:10-375:3; Officer Guide, Ex. E at § 113-02.  The half-hour meal break is automatically deducted from the Officers' and Sergeants' work schedules.  *See* Adams 30(b)(6) Tr., Ex. K at 73:14-74:13; August 22 Wright 30(b)(6) Tr, Ex. I at 139:10-18; August 23 Wright 30(b(6) Tr. Ex. J at 375:4-10.  This results in Plaintiffs being assigned to an 8.5 hour tour but actually working a total of 8 hours during the shift.  Officers and Sergeants are required to record their meal period in their memo books.  *See* Adams 30(b)(6) Tr., Ex. K at 73:11-13; Officer Guide, Ex. E at § 113-02.  Officers and Sergeants are encouraged to clock in and out for their meal period, or record their meal period in CityTime, but are not required to do so.  *See* August 23 Wright 30(b)(6) Tr., Ex. J at 380:14-381:10; Adams 30(b)(6) Tr., Ex. K at 73:23-74:9.  Sergeants, including Plaintiffs herein, are typically responsible for scheduling Officers' meal breaks and enforcing the daily half-hour meal break.  *See* Adams 30(b)(6) Tr., Ex. K at 72:10-73:4; Officer Guide, Ex. E at § 113-02.  If an emergency such as an arrest occurs during an Officer's or Sergeant's meal break, the employee

may be required to suspend his or her meal break and respond.  *See* Adams 30(b)(6) Tr., Ex. K at 145:21-147:22; Officer Guide, Ex. E at § 113-02.  In such a scenario, the Sergeant is responsible for ensuring that the Officer finishes his or her meal break, or requests overtime for the portion of his or her meal break which he or she could not take.  *See* Adams 30(b)(6) Tr., Ex. K at 146:7-147:5; Officer Guide, Ex. E at § 113-02.

### C.   OVERTIME PROCEDURE AND PAYMENTS TO PLAINTIFFS

Plaintiffs are required to submit an overtime request in the CityTime system for any time worked outside of their regular schedule.  *See* Pestana 30(b)(6) Tr., Ex. H at 59:21-60:11, 68:10-14; OT Policy, Ex. F at 3.  Plaintiffs are then compensated for the time worked during their scheduled shifts, as well as any overtime requested and approved in CityTime.  *See* Pestana 30(b)(6) Tr., Ex. H at 68:10-14, 115:12-116:2.  All overtime requests require two levels of approval.  *See* August 22 Wright 30(b)(6) Tr., Ex. I at 184-185.  An employee's immediate supervisor is the first level approver of overtime in CityTime.  *See* August 22 Wright (30)(b)(6) Tr., Ex. I at 184:14-19.  As such, Sergeants are the first level overtime approvers for Officers, and Supervising Special Officers, Level II ("Captains") are the first level approvers for the Sergeants.  *Id.*

Both the City and DHS's overtime policy is that Plaintiffs should request and receive preapproval from their immediate supervisor before working any time outside of their regular schedule.  *See* Pestana 30(b)(6) Tr., Ex. H at 54:21-55:8, 195:19-196:4; August 22 Wright 30(b)(6) Tr., Ex. I at 71:6-10.  However, if a Plaintiff does not obtain prior authorization to work overtime but actually works in excess of their regularly scheduled tour, City policy is to pay Plaintiff for the overtime worked absent pre-approval.  *See* Pestana 30(b)(6) Tr., Ex. H at 67:2-9.  Indeed, overtime requests in CityTime are routinely approved even if they did not receive

preapproval to work such time.  For example, Plaintiffs are often required to work beyond their scheduled hours when effectuating arrests, and are paid overtime despite not technically receiving pre-approval.  *See* August 22 Wright 30(b)(6) Tr., Ex. I at 96:10-97:19.  Moreover, if the City becomes aware that an employee worked outside of his or her scheduled hours but did not request overtime compensation in CityTime for such time, it is the City's policy to pay the employee for the overtime worked.  *See* Pestana 30(b)(6) Tr., Ex. H at 67:7-68:14, 195:19-196:22.

Plaintiffs are able to request overtime for any time worked outside of their regular schedules, whether such time worked is before/after their shifts or during their meal breaks.  *See* Pestana 30(b)(6) Tr., Ex. H at 59:9-60:20, 138:20-139:24, 197:18-198:8.  Plaintiffs understood how to submit an overtime request in CityTime and that they would not be paid for this work unless they did so.  *See* Abraham Tr., Ex. M at 56:9-18; Cook Tr., Ex. S at 23:20-24:2; Dudzik Tr., Ex. T at 40:8-41:7; Mas Tr., Ex. U at 53:23-54:15; McCraw Tr., Ex. P at 89:25-91:2; Rosario Tr., Ex. Q at 26:11-21; A. Vasquez Tr., Ex. R at 71:13-74:12.  At the end of each week, before submitting their timesheets, Plaintiffs are required to certify the accuracy of their time records in CityTime.  *See* DHS Timekeeping Training, Ex. V at DEF 000017, DEF 000019; CityTime Web Course, Ex. W at DEF 000630; CityTime Reminder, Ex. X.  Plaintiffs also certify that they have requested compensation for all time worked in excess of their tour.  *Id.*

## III.  PLAINTIFFS' PRE-SHIFT, POST-SHIFT AND MEAL PERIOD CLAIMS ARE BASED UPON HIGHLY INDIVIDUALIZED CIRCUMSTANCES

On November 16, 2017, the parties entered into a discovery stipulation governing Count I of the Complaint in this action, which was so-Ordered on November 21, 2017.  *See* ECF Docket No. 54.  Pursuant to the parties' discovery stipulation, the parties randomly selected 24 "discovery Plaintiffs" on February 13, 2018 - 19 "discovery plaintiffs" are current or former

Officers with DHS and 5 "discovery Plaintiffs" are current or former Sergeants with DHS. Twenty-three of the "discovery Plaintiffs" were deposed (18 Officers and 5 Sergeants, however some of the Officers deposed had also served in the role of Sergeant pursuant to a promotion). Plaintiffs' Off the Clock Claims are predicated on three types of allegedly unpaid work: pre-shift work, post-shift work and work performed during a meal break.  The deposed Plaintiffs testified that their meal period, pre-shift, and post-shift claims are based upon highly individualized allegations including, but not limited to their specific work locations, assigned details and posts, supervisors and their practices, and personal choices.

### A. Meal Period Claims

Plaintiffs' meal period claims are unsuitable for class treatment as they are based upon highly individualized factors.  For example, Plaintiff James Johnson ("Johnson") served as both an Officer and Sergeant during the relevant time period.  *See* J. Johnson Tr., Ex. N at 22:6-23:11. Johnson testified that when he was an Officer, he did not work through his meal break and typically took his break from 7:00 p.m. to 7:30 p.m.  *Id.* at 72:25-75:1.  Johnson testified that if there was an arrest or altercation in the facility that precluded him from taking his break at this time, he would take it at a different time.  *Id.* at 73:24-74:18.  In contrast, Johnson testified that when he was an Sergeant at Bedford Atlantic Men's Shelter, he was only able to take a half-hour uninterrupted meal break one day each week, and otherwise did not take a meal period, or ate while he was working.  *Id.* at 61:24-64:6.  However, Johnson says that when he was a Sergeant at the BRC Assessment Center, he was able to take a 30-minute meal break because he had a partner.  *Id.* at 75:11-78:1.  Thus, Plaintiff Johnson's meal time claim is wholly dependent upon his title at the time, and the individual circumstances of his assignment and work location.

A sampling of testimony from the other Plaintiffs clearly demonstrates that Plaintiffs' meal period claims are based upon highly individualized allegations, and are not properly suited for collective treatment:

| Officers | |
|---|---|
| **Plaintiff** | **Individual Circumstances Impacting Meal Time Claim** |
| Maniotis, Jessica (Officer) | Takes meal break at PATH Shelter, does not eat at post or work during meal. (Maniotis Tr., Ex. O at 64:6-66:24). Might skip meal break if there's an arrest, which rarely happens (*Id.*). Once worked through meal, requested overtime for that period, and believes she was paid overtime. (*Id.* at 66:25-68:12) |
| Francois Davis, Shirley (Officer) | At Stadium Women's Shelter, "for the most part [her] meal breaks were [her] meal breaks," but "everything was different every day." (Francois Tr., Ex. Y at 98:4-14). At PATH, could not say how often she could not take a meal because "every day was a different situation depending on [her] post." (*Id.* at 98:23-99:10)   For example, if she was on access control and confiscated drugs, she could not have a meal break because there was paperwork to complete. (*Id.*) |
| Robinson Christian (Officer) | Took a meal break while he worked at Bowery Residence.  (Robinson Tr., Ex. Z at 17:2-17, 62:19-63:16. Would eat in the locker room, and would never at his assigned post (*Id.* at 66:7-22). Would skip meal in serious situations, i.e. crimes where all officers were needed to help, approx. once per week (*Id.* at 66:23-67:11). Never requested overtime for working through meal because no one ever told him to do so. (*Id.* at 67:12-68:17). |
| Rosario, Edwin (Officer) | Takes a meal break in the locker room, except when he is on an arrest or MVO detail (Rosario Tr., Ex. Q at 57:2-11). Arrest details vary in frequency, MVO details occur every two weeks (*Id.*). Never instructed to work through meal, just that he can go home once he completes the detail (*Id.* at 57:12-19).  Some sergeants at PATH and Jack Ryan Residence facilities tell officers to stand by for meal if there's a "condition going on," and no one takes meal until further notice. (*Id.* at 58:13-59:9). |
| Vaughan, Keith (Officer) | If working in the field on warrant detail, would eat on the road. (Deposition of Discovery Plaintiff Keith Vaughan, ("Vaughan Tr."), Ex. AA at 19:22-20:9).  If he was at 30th Street, would eat at his desk while working.  (*Id.* at 76:24-77:24).  Some sergeants would tell him to take a meal break. (*Id.* at 20:23-21:6). No one told him to work during his meal, but he does it because more work will be coming (*Id.* at 78:21-79:22). Would not get a meal 4-5 times per year (*Id.* at 81:13-19). |
| Augustin, Ted (Officer) | In Operations assignment, he works during meal break and eats at his post, answering phones and emails (Augustin Tr., Ex. BB at 61:6-64:18. Cannot take a meal 2-3 times per week (*Id.* at 64:24-65:13). But when he was assigned to LIFE Shelter, received an uninterrupted 30-minute meal break and ate lunch in an area by the locker room (*Id.* at 63:1-64:23). |

| Burton, Shonda (Officer) | Took meal whenever her supervisor, Sergeant Dionne Beckett said she could. (Deposition of Discovery Plaintiff Shonda Burton, ("Burton Tr."), Ex. CC at 20:25-21:25). Ate in the locker room (*Id.* at 65:3-16). Would not take meal break if she was on an arrest or hospital escort (*Id.* at 67:2-6). Sergeant Beckett directed Burton to work during meals (*Id.* at 89:14-19). She once requested overtime for working through part of her meal but that request was denied (*Id.* at 70:24-72:22, 76:1-14). |
|---|---|
| Brackett, Elijah (Officer) | Skipped meals and recorded in his memo book that he took meal, even if he did not. (Brackett Tr., Ex. DD at 27:6-24). Could not take meal if he was doing an EDP escort or processing an arrest (*Id.* at 44:20-25). Sergeant Jarrin once denied his request to take meal break and said he could take it when he got coverage. (*Id.* at 13:19-14:8). He never got coverage. (*Id.*) Jarrin said to put 30 minutes on CityTime for meal, even if he did not take 30 minutes. (*Id.* at 57:4-61:17). |

| Sergeants | |
|---|---|
| **Plaintiff** | **Individual Circumstances Impacting Meal Time Claim** |
| Abraham, Jermaine (Sergeant) | As a sergeant, can only take meal break if he has a partner (Abraham Tr., Ex. M at 24:1-18, 92:14-93:25). Unable to take meal due to not having a partner 2-3 times per week (*Id.* at 93:19-25). Whether he can take meal "depends…[on] what is going on for the day." (*Id.* at 97:8-98:1) At Flatlands, if there is an arrest, have to complete paperwork during meal, and sometimes they are short-staffed. (*Id.*). Has pulled SOs off meal breaks for arrests, lets them finish meal later. (*Id.* at 119:23-120:25) |
| Cartagena, Marcos (Sergeant) | If it was quiet in the building and he had a partner, he would exit facility to buy lunch, and eat his meal upstairs. (Cartagena Tr., Ex. EE at 75:25-76:20). If no other Officer was on duty, he ate his meal quickly at his desk (*Id.* at 77:18-79:17). Officers had scheduled meal periods, but Sergeants did not. (*Id.* at 76:8-11). Would skip meal entirely approximately once per week (*Id.* at 78:24-79:17). |
| Henry, Edmund (Sergeant) | Does not normally take a meal break, but has taken at least one meal since 11/18/13. (Henry Tr., Ex. FF at 19:12-19, 57:6-59:7). Does not eat at nights, skips his meal all 5 days a week (*Id.* at 77:23-78:12). The special officers he supervises do not have a scheduled meal break, and only get a meal break if he allows them to take one. (*Id.* at 29:13-30:25). |
| Mas, Jonathan (Sergeant) | Sometimes cannot take meals because it is so busy, happens every week (Mas Tr., Ex. U at 84:4-85:24). Sometimes works through his meal "upwards of a half a dozen times [per] week," despite only being scheduled to work 5 days per week. (*Id.* at 88:13-17; 24:17-20). Does not really get meal where he's not working, as he is always "on duty" (*Id.* at 108-109) |

Plaintiffs' meal period claims are not suitable for class treatment because they are based upon highly individualized factors such as the facility to which they are assigned, their assigned details or posts, their supervisors' practices, and their own personal preferences about taking meal breaks.

### B.      Pre-Shift and Post-Shift Claims

Plaintiffs' pre-shift and post-shift claims are also unsuitable for class treatment because they are based upon factors and circumstances unique to each Plaintiff.  For an example related specifically to pre-shift claims, a sampling of the deposed Plaintiffs shows that, while nearly all Plaintiffs agree that they are scheduled to arrive 30 minutes before their policing duties begin, the actual time that Plaintiffs arrive, their alleged pre-shift responsibilities, and how long it allegedly takes them to prepare for their shifts, all vary greatly:

| Officers | |
|---|---|
| **Plaintiff** | **Individual Circumstances Impacting Pre-Shift Claims** |
| Rosario, Edwin (Officer) | Arrives on time or within five minute grace period. (Rosario Tr., Ex. Q at 31:23-32:14).  Only has to change into uniform and check equipment before roll call. (*Id.* at 38:20-23).  Takes five minutes to put on uniform. (*Id.* at 34:25-35:1). |
| Johnson, Lanesha (Officer) | Usually arrived 10-15 minutes early. (L. Johnson Tr., Ex. GG at 30:8-12).  Roll call occurred 15 minutes after she was scheduled to arrive.  (*Id.* at 15:4-21). Before roll call, she would change into uniform, update her memo book, and talk with coworkers. (*Id.* at 30:25-31:7; 39:15-42:5). It took 10 minutes to change into her uniform.  (*Id.* at 32:7-9). |
| Maniotis, Jessica (Officer) | Scheduled to arrive at 2:00 pm, roll call is at 2:15 pm, and the 15 minutes before roll call are for changing into uniform and getting ready. (Maniotis Tr., Ex. O at 15:14-16:13, 35:2-3, 52:1-5).  Still arrives 15-30 minutes earlier than scheduled, at 1:30 pm - 1:45 pm, to get changed, prepare memo book, and talk with coworkers. (*Id.* at 42:3-43:24, 48).  Changing takes 15 minutes (*Id.* at 49:3-4).  Her supervisor arrives around 2:00 pm. (*Id.* at 61:11-13). |
| Vaughn, Keith (Officer) | Arrived 30-45 minutes before scheduled start time. (Vaughn Tr., Ex. AA at 52:13-53:18).  Pre-shift duties were preparing his equipment, changing into uniform, talking with coworkers. (*Id.* at 53:11-54:16). It took 30-45 minutes to put on his uniform. (*Id.* at 63:13-20). |
| Seidi-Gbamuse, Adekoya (Officer) | Arrives 30-45 minutes before scheduled start because of staff shortage at the Boulevard Shelter. (Seidi-Gbamuse Tr., Ex. HH at 38:9-24). Clocks in, goes upstairs to see if coworkers need help, assists if necessary. (*Id.* at 39:3-16) Changes into uniform and then gets coffee. (*Id.* at 39:17-22). Takes 5-10 minutes to put on uniform (*Id.* at 115:4-14).  Several times a month, he begins his shift by assisting with transport duty, and misses roll call. (*Id.* at 58:19-62:7) |
| Brackett, Elijah (Officer) | Arrives 45-60 minutes before scheduled start, but does not clock in until 11:30 am, when his tour begins. (Brackett Tr., Ex. DD at 31:5-12). Arrives early to put on uniform, which takes 8-10 minutes (Id. at 31:13-32:10). His only duties before roll call are changing and inspecting equipment. (*Id.* at 34:24-35:25). Sergeant Jarrin told him not to request overtime for working before his shift.  (*Id.* at 22:12-23:17). |

| Augustin, Ted (Officer) | Arrives at Atlantic Men's Shelter 45-75 minutes early, and arrived 90 minutes early at LIFE Shelter. (Augustin Tr., Ex. BB at 36:3-37:5, 77:17-25).  Arrives that early because of "habit." (*Id.* at 37:4-5). Pre-shift tasks include changing into uniform, sending emails, attending roll call, and preparing equipment. (*Id.* at 50:13-51:18, 78:1-13).  Takes 5 minutes to put on uniform (*Id.* at 39:2-4). Sergeants Nadia Brown and Thomasina Brown have seen him perform pre-shift work, asked him to relieve officers when he arrives early.  (*Id.* at 75:7-76:6). |

| Sergeants | |
|---|---|
| **Plaintiff** | **Individual Circumstances Impacting Pre-Shift Claims** |
| Mas, Jonathan (Sergeant) | Arrives on time at 3:30 pm. (Mas Tr., Ex. U at 21:17-22; 61:2-6).  As a sergeant, he has to get dressed, speak with outgoing sergeant, prepare for roll call, and lead roll call at 3:45 pm.  (*Id.* at 61:21-62:11). He is typically able to get dressed and complete roll call by 4:00 pm (*Id.* at 70:17-24). |
| Abraham, Jermaine (Sergeant) | Supposed to clock in at 7:30 am, but usually clocked in 15-30 minutes early to dress and get briefed by the outgoing sergeant. (Abraham Tr., Ex. M at 66:5-25).  As a sergeant, also had to prepare command log, inspect SOs' uniforms, and prepare paperwork before roll call.  (*Id.* at 72:16-73:12). |

Additionally, Plaintiffs' testimony varied with respect to work allegedly performed after their shift ended.   The primary difference in the testimony was the significant variations regarding what amount of time allegedly worked beyond their shift end time would warrant the Plaintiff submitting a request for overtime compensation to cover that time.

| Officers | |
|---|---|
| **Plaintiff** | **Individual Practices Regarding Threshold Amount for OT** |
| Cruz, Miguel (Officer) | No minimum amount of time to submit as overtime.  (Cruz Tr., Ex. II at 98:8-21). |
| Seidi-Gbamuse, Adekoya (Officer) | Would request overtime for 10 minutes or more. (Seidi-Gbamuse Tr., Ex. HH at 92:7-93:13). |
| Maniotis, Jessica (Officer) | Would request overtime for 15 minutes or more. (Maniotis Tr., Ex. O at 75:13-76:2). |
| Vasquez, Anthony (Officer) | Would request overtime for 30 minutes, but probably not less than that. (A. Vasquez Tr., Ex. R at 166:24-167:10).  Would "take it upon himself" not to request overtime for less than 30 minutes because sometimes his relieving officers are delayed by mass transit. (*Id.* at 167:11-24). |

| Rosario, Edwin (Officer) | Would request overtime for 1 hour or more. (Rosario Tr., Ex. Q at 65:24-67:16). Was instructed in the academy that DHS would not pay for less than 1 hour of overtime. (*Id.* at 67:3-13). |
|---|---|
| Augustin, Ted (Officer) | Would not submit OT request for anything less than 90-120 minutes (Augustin Tr., Ex. BB at 71:22-72:19). Early in his career, a Captain told him not to submit an overtime request for anything less than 45 minutes (*Id.* at 65:14-66:1). Would not request overtime if his relieving officer was late or if he came in early to help his coworkers. (*Id.* at 73:4-18). |

| Sergeants | |
|---|---|
| **Plaintiff** | **Individual Practices Regarding Threshold Amount for OT** |
| Dudzik, John (Sergeant) | Would request overtime for 15 minutes or more. (Dudzik Tr., Ex. T at 142:5-8). Minimum used to be one hour.  (*Id.* at 141:19-142:8). He has received overtime requests for 8-15 minutes, but he would not personally submit an overtime request for that amount.  (*Id.* at 141:22-142:1). Can't recall ever denying an overtime request. (*Id.* at 145:9-10). |
| Henry, Edmund (Sergeant) | Would request overtime for 15 minutes or more, because that amount of time "looks reasonable." (Henry Tr., Ex. FF at 82:6-15). Requesting overtime for less than 15 minutes "would be mean." (*Id.* at 83:15-85:7). But any time worked after the end of his schedule is overtime.  (*Id.* at 84:2-6). |
| McCraw, Brian (Sergeant) | Would request overtime for 30 minutes. (McCraw Tr., Ex. P at 159:1-5).  Not sure if he would request overtime for 10 minutes, says it would depend upon whether the overtime was voluntary or involuntary.  (*Id.* at 159:20-161:24). |
| Mas, Jonathan (Sergeant) | Would request overtime for at least 45 minutes to 1 hour, but not for 30 minutes. (Mas Tr., Ex. U at 97:5-98:23).  No one ever told him that there was a minimum overtime requirement of 1 hour. (*Id.* at 97:20-25).  Anything past the end of your shift should be overtime. (*Id.*). |
| Abraham, Jermaine (Sergeant) | Would request overtime for 1 hour or more. (Abraham Tr., Ex. M at 107:23-108:19).  Heard 1 hour was the minimum amount of overtime through word of mouth, approx. 9-10 years before he was deposed, from retired Lieutenant Robinson (*Id.*). |

As illustrated by the above sampling of deposition testimony, Plaintiffs' claims are unsuitable for collective, class treatment as they are based upon individualized, fact-specific variables including, but not limited to, the specific facility to which Plaintiffs are assigned, their assigned details or posts, their supervisors' practices, and their own personal preferences about when to request overtime.

IV.   **PLAINTIFFS' CLAIMS ARE BASED UPON THE INDIVIDUAL PRACTICES OF THEIR SUPERVISING SPECIAL OFFICERS, MANY OF WHOM ARE ALSO PLAINTIFFS IN THIS ACTION**

Plaintiffs testified to facts demonstrating that their pre-shift, post-shift, and meal period claims are based upon the individualized and varying practices of their supervisors - including Sergeants - rather than a common policy or plan that violates the law.  Indeed, many of the deposed Plaintiffs identified other Plaintiffs as supervisors who allegedly observed or were aware of Plaintiffs working through meal breaks, before their scheduled hours, or after their scheduled hours, and allegedly instructed them not to request overtime.

For example, Discovery Plaintiff Elijah Brackett testified that for his entire tenure at DHS, he was directly supervised by Sergeant Glennd Jarrin ("Jarrin"), who was responsible for initially approving his timesheets.  *See* Brackett Tr., Ex. DD at 13:14-15:6.  Glennd Jarrin is also a Plaintiff in this action.  In his interrogatory responses, Brackett identifies Jarrin as a supervisor who allegedly observed or was aware of him performing pre-shift, post-shift, and meal period work for which Brackett was not compensated.  *See* Plaintiff Elijah Brackett's Response to Defendant's First Set of Interrogatories, Ex. JJ at 4-26.  Brackett testified that Jarrin was aware of him performing pre-shift work, because Plaintiff would be the first to arrive in the locker room and would inform Jarrin of incidents that occurred before Jarrin arrived at the facility.  *See* Brackett Tr., Ex. DD at 55:3-11.  Brackett testified that he would come into work 30 minutes before he was supposed to punch in, but that Jarrin instructed him not to request overtime for that pre-shift time.  *See* Brackett Tr., Ex. DD at 22:12-23:17.  Brackett also testified that Jarrin denied him meal breaks when he asked for them.  *See* Brackett Tr., Ex. DD at 13:19-14:8.  Brackett also testified that Jarrin instructed him to record 30 minutes of meal time each day in CityTime and in

14

his memo book, even if Brackett did not take a full 30-minute meal break.  *See* Brackett Tr., Ex. DD at 27:6-24; 57:4-59:9; 61:3-17.

Additionally, Discovery Plaintiff Shonda Burton testified that she was directly supervised by Sergeant Dionne Beckett ("Beckett").  *See* Burton Tr., Ex. CC at 15:14-17.  Dionne Beckett is also a Plaintiff in this action.  Burton testified that she took her meal break whenever Beckett told her to take a meal break.  *See* Burton Tr., Ex. CC at 20:25-21:25.  She also testified that Beckett frequently directed her to work during her meal breaks.  *See* Burton Tr., Ex. CC at 89:14-19; Plaintiff Shonda Burton's Response to Defendant's First Set of Interrogatories, Ex. KK.  Burton testified that Beckett instructed Burton that she could not submit overtime requests for working through a portion of her meal break.  *See* Burton Tr., Ex. CC at 72:6-73:10.  Burton testified that she once submitted an overtime request for working during her meal break, but did not submit any further overtime requests for working during her meal period after Beckett denied that request.  *See* Burton Tr., Ex. CC at 70:24-72:22, 76:1-14.  As illustrated by the above examples, Plaintiffs' off-the-clock claims are largely based upon the individual actions and practices of their supervisors, many of whom are also Plaintiffs in this action.

## ARGUMENT

### THE   COLLECTIVE   SHOULD   BE DECERTIFIED

The record evidence shows that the continued certification of this collective is inappropriate and, therefore, it should be decertified.

**A.   Applicable Legal Standard**

The Second Circuit applies a two-step process for certification of a collective action under § 216(b) of the Fair Labor Standards Act ("FLSA").  *Myers v. Hertz Corp.,* 624 F.3d 537, 554-55 (2d Cir. 2010).  At the first step, the court conducts "an initial determination" to notify

potential opt-in plaintiffs "who may be 'similarly situated' to the named plaintiffs with respect to whether a FLSA violation has occurred." *Id.* at 554-55 (internal citations omitted). Plaintiffs may fulfill their burden during the first stage by making a "modest factual showing" demonstrating that both they and the opt-in employees were victims of a common, unlawful policy. *Id.* at 555. However, several Second Circuit decisions "rejected efforts to conditionally certify collectives where the plaintiffs were unable to demonstrate that employees at locations where they did not work were subject to the same allegedly unlawful policy or practice." *Trinidad v. Pret A Manger*, 962 F. Supp. 2d 545, 557-60 (S.D.N.Y. 2013).

The second step requires the court to review a fuller record, and determine "whether the plaintiffs who have opted in are in fact similarly situated to the named plaintiffs." *Myers*, 624 F.3d at 555 (citations and internal quotation marks omitted). When the court makes its determination at the second stage, it "examines the proposed class under the following three prongs: (1) common or disparate factual and employment settings of the individual plaintiffs; (2) defenses available which appear common to all plaintiff's or individual to each plaintiff; and (3) fairness and procedural considerations." *Seward v. IBM*, 2012 U.S. Dist. LEXIS 49688, at *54-55 (S.D.N.Y. 2012); *see, e.g., Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011). Plaintiffs maintain the burden of proving, by a preponderance of evidence (*Zavala v. Wal-Mart Stores Inc.*, 691 F.3d 527, 537 (3d Cir. 2012)), that the opt-in plaintiffs are similarly situated and the court now, in light of the fuller record, "must apply a more stringent standard of proof in determining whether plaintiff's are similarly situated for the purposes of the FLSA." *Seward*, 2012 U.S. Dist. LEXIS 49688, at *54-55. "A similar situation exists if there is a factual nexus between" all of the plaintiffs. *Diaz v. Elecs. Boutique of Am., Inc.*, 2005 U.S. Dist. LEXIS 30382, at *10 (W.D.N.Y. 2005).

Whether a collective should be certified "is extremely fact-dependent" and "largely in the court's discretion." *Seward*, 2012 U.S. Dist. LEXIS 49688, at *56. "Relevant factors include []: whether the plaintiffs are employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment." *Zavala*, 691 F.3d at 537. "Plaintiffs may also be found dissimilar based on the existence of individualized defenses." *Id.* at 536-7. Absent a company-wide policy or practice, "plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation." *Zivali*, 784 F. Supp. 2d at 468. Plaintiffs cannot meet their burden of demonstrating that the collective of 494 Officers and Sergeants is similarly situated for the purposes of the FLSA.

**B.**   **Plaintiffs' Claims Are Predicated On Their Own Individual Circumstances**

Discovery has shown that Plaintiffs' off-the-clock claims are not suitable for collective treatment because: (1) Officers are not similarly situated to Sergeants because of their different professional responsibilities, particularly because Sergeants approve Officers' timesheets and overtime requests; (2) Plaintiffs' claims are based upon their individual employment circumstances, such as their particular supervisors, posts and assignments, facilities, and personal customs and preferences; and (3) Plaintiffs' claims are subject to differing defenses.

**1.**   **Officers are not Similarly Situated to Sergeants**

Officers are not similarly situated to Sergeants because the job responsibilities for Sergeants are materially different from those of Officers. While both Officers and Sergeants patrol and secure DHS facilities, Sergeants directly supervise Officers, and are responsible for functions related to timekeeping and administering meal breaks that form the basis of Officers' alleged off-the-clock overtime claims. *See* Sergeant Title Spec., Ex. C at 1-2; Sergeant Master

17

T&S, Ex. D at 2.   Specifically, Sergeants are responsible for initially approving Officers' timesheets and overtime requests in CityTime.   *See* Sergeant Master T&S, Ex. D at 2; Officer Guide, Ex. E at § 107-04; OT Policy, Ex. F at 3; Code of Conduct, Ex. G at 14-15.   Sergeants are also typically responsible for telling Officers when to take their meal breaks, pulling Officers off of their meal breaks to respond to emergency situations, and for ensuring that Officers finish their meal breaks if they are interrupted.   *See* Mas Tr., Ex. U at 90:25-91:12; Abraham Tr., Ex. M at 119:23-120:25; Henry Tr., Ex. FF at 29:13-30:25; McCraw Tr., Ex. P at 171:3-8; Dudzik Tr., Ex. T at 148:1-14.   In addition to these timekeeping and meal coordination duties, Sergeants have many other responsibilities that Officers do not, including: evaluating Officers' job performance, disciplining Officers through verbal reprimands and corrective meetings, conducting daily roll call sessions, training Officers on the job, maintaining DHS records such as command logs, and communicating with higher-ranking officials such as Lieutenants, Captains, and Deputy Inspectors about the day-to-day operation of DHS facilities.   *See* Sergeant Title Spec., Ex. C.

There is an inherent conflict between the Officers and Sergeants represented in this purported collective, as the deposed Officers identified Sergeants who were allegedly aware of them performing unpaid work before and after their scheduled hours, and during their meal breaks.   *See supra* Statement of Facts, Section IV.   This conflict illustrates the material difference between the job responsibilities for Officers and Sergeants, and underscores why all plaintiffs in this purported collective are not similarly situated.   For example, Officer Elijah Brackett and his supervisor Sergeant Glennd Jarrin are both plaintiffs in this action.   *See* Brackett Tr., Ex. DD at 13:14-15:6.   In his interrogatory responses, Brackett states that Sergeant Jarrin knew he was working before and after his scheduled hours, and during his meal period, but was

not being paid overtime for that work.  *See* Plaintiff Elijah Brackett's Response to Defendant's First Set of Interrogatories, Ex. JJ at 4-26.  Brackett testified that Jarrin, who was responsible for approving his overtime requests, told him not to request overtime for performing 30 minutes of work before he was scheduled to arrive.  *See* Brackett Tr., Ex. DD at 22:12-23:17.  Brackett testified that Jarrin denied his requests for meal breaks, and told him to record 30 minutes of meal break in CityTime and in his memo book, regardless of whether he took a 30 minute meal break.  *Id.* at 13:19-14:8; 27:6-24; 57:4-59:9; 61:3-17.  Based upon these allegations, Plaintiff Brackett's off-the-clock overtime claims are clearly founded, in part, on Plaintiff Jarrin's conduct as a supervisor – conduct that clearly violates City policy with respect to overtime.  *See* Pestana 30(b)(6) Tr., Ex. H at 59:9-60:20, 138:20-139:24, 197:18-198:8.

Additionally, Officer Shonda Burton and her supervisor Sergeant Dionne Beckett are both Plaintiffs in this action.  *See* Burton Tr., Ex. CC at 15:14-17.  Burton testified that she took a meal break when Beckett instructed her to take a meal break.  *Id.* at 20:25-21:25.  Burton also testified that Beckett, who was responsible for approving her overtime, frequently instructed Burton to work during her meal period, and told Burton that she could not request overtime for working during part of her meal period.  *Id.* at 89:14-19; 72:6-73:10.  This alleged instruction is contrary to City policy.  *See* Pestana 30(b)(6) Tr., Ex. H at 59:9-60:20, 138:20-139:24, 197:18-198:8.  Burton testified that on one occasion, she submitted an overtime request for working during her meal period, but that Beckett denied that request.  *See* Burton Tr., Ex. CC at 70:24-72:22, 76:1-14.  Again, if true, this allegation demonstrates that Beckett deviated from establish City policy with respect to overtime.  Burton testified that she did not submit any further overtime requests for working during her meal break after Beckett denied that request.  *Id.*

Thus, while Officers and Sergeants work in the same DHS facilities and are both broadly tasked with securing those facilities, Sergeants have materially different job responsibilities than Officers, particularly with regard to initially approving Officers' timesheets and overtime requests, as well as scheduling when Officers can take their meal periods.  Most significantly, these additional timekeeping and meal period supervisory responsibilities shouldered by Sergeants form the basis of the off-the-clock overtime claims made by the plaintiff Officers in this case.  Therefore, all Plaintiffs are not similarly situated because Officers and Sergeants have materially different job responsibilities, and because plaintiff Officers' off-the-clock overtime claims are based upon the alleged supervisory conduct of plaintiff Sergeants.

2.      **Plaintiffs' Claims are Dependent upon Individualized Factors such as their Particular Supervisors, Posts and Assignments, Facilities, and Personal Customs and Preferences**

Far from alleging a common, unlawful policy, the testimony of the twenty-three deposed Plaintiffs clearly demonstrates that Plaintiffs' off-the-clock overtime claims are based on Plaintiffs' individual, highly fact-specific employment circumstances.  To establish liability under the FLSA, a plaintiff must demonstrate that she performed work, never received compensation for that work, "and that the employer had actual or constructive knowledge of that work." *Kuebel v. Black & Decker, Inc.*, 643 F.3d 352,365 (2d Cir. 2011); *Zivali,* 784 F. Supp. 2d at 468 ("In the absence of a company-wide policy or practice, plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation.")  But when the question of an employer's actual or constructive knowledge requires an individualized assessment, certification is improper.  *See Gordon v. Kaleida Health*, 299 F.R.D. 380, 392, 404 (W.D.N.Y. 2014).

To determine whether plaintiffs establish that members of the collective are similarly situated with regard to their employment settings, courts may look to "whether the plaintiffs are

employed in the same corporate department, division, and location; whether they advance similar claims; whether they seek substantially the same form of relief; and whether they have similar salaries and circumstances of employment." *Zavala*, 691 F.3d at 537.  Relevant factors include: the number and location of employees, number of supervisors, differences in hose supervisors' practices, and whether those supervisors adhered to the alleged unlawful policies or practices identified by plaintiffs.  *Ruiz v. Citibank, N.A.*, 93 F. Supp. 3d 279, 300 (S.D.N.Y. 2015); *Zivali* 784 F. Supp. 2d at 464-65; *see also Thind v. Healthfirst Mgmt. Servs., LLC*, 2016 U.S. Dist. LEXIS 170503, at *3 (S.D.N.Y. 2016) ("Differing factual circumstances, particularly with regard to differences in supervisory authority, can provide justification for decertification."); *Morano v. Intercontinental Capital Grp., Inc.*, 2012 U.S. Dist. LEXIS 100830, at *7 (S.D.N.Y. 2012) (decertifying class in part due to "differences in . . . supervising directives").

In *DeSilva v. N. Shore-Long Island Jewish Health System*, 27 F. Supp. 3d 313, 321 (E.D.N.Y. 2014), for example, the court reviewed, among other items, the number of departments, business units, positions, management practices with respect to meal breaks, and the practices of employees with respect to reporting time worked.  *See DeSilva*, 27 F. Supp. 3d at 323-35.  The court, in decertifying the collective, explained that representative testimony could not answer questions of liability because "when [p]laintiffs took meal breaks, and the frequency with which they took them depended upon their particular work environment and their job duties."  *Id.*  Similarly, in *Zivali*, the court decertified the collective where "the evidence points to an extremely wide range of company practices in the context of varied factual and employment settings."  *Zivali*, 784 F. Supp. 2d at 464.  Additionally, the *Seward* court ruled that the plaintiff failed to demonstrate that he shared "common factual and employment settings with all of the opt-in plaintiffs," as a result of a "uniform and pervasive policy requiring off-the-clock

work" due to the various team functions, job duties, and individual plaintiff experiences. *Seward*, 2012 U.S. Dist. LEXIS 49688, at *80; *see also Zivali*, 784 F. Supp. 2d at 463-67.

Here, Plaintiffs testified that their off-the-clock claims differed greatly based upon: how their individual supervisors administer meal breaks and timekeeping, which DHS facilities they are assigned to and what their specific assignments are. Further, Plaintiffs' own preferences and practices have a large impact on their individual claims, including when a particular Plaintiff prefers to arrive at work, and the minimum amount of time worked beyond their scheduled hours for which a Plaintiff would request overtime. Indeed, the seven deposed Plaintiffs who served as Sergeants varied greatly with regard to how they handled their subordinates' timekeeping and meal breaks. Most deposed Sergeants testified that if an Officer worked overtime but did not submit a request for overtime, the Sergeant would tell the Officer to submit an overtime request. *See* Abraham Tr., Ex. M at 115:25-116:7; Henry Tr., Ex. FF at 22:23-23:16; Mas Tr., Ex. U at 101:18-25; Dudzik Tr., Ex. T at 145:11-16. However, Plaintiff Brian McCraw testified that he is not required to tell his subordinates to request overtime, and that it is the Officer's responsibility to request overtime. *See* McCraw Tr. Ex. P at 170:6-172:3. In contrast, Discovery Plaintiff Marcos Cartagena testified that if one of his Officers had not submitted an overtime request for time he or she worked beyond their scheduled hours, he would not only instruct the officer to submit an overtime request, but would report the incident to his supervising Lieutenant if the Officer thereafter failed to submit an overtime request. *See* Cartagena Tr., Ex. EE at 92:12-15. Additionally, Plaintiffs who served as Sergeants testified that they had varying practices with regard to asking Officers to work during their meal breaks. Discovery Plaintiff Edmund Henry testified that he never directed his subordinates to work during their meal periods. *See* Henry Tr., Ex. FF at 87:10-15. Conversely, several Plaintiffs who served as Sergeants testified that

they had pulled Officers off of their meal periods to address arrests or other incidents, but if possible, let the officers finish their meals when the incidents in question were resolved.  *See* Mas Tr., Ex. U at 90:25-91:12; McCraw Tr., Ex. P at 171:3-8; Dudzik Tr., Ex. T at 148:1-14.

Moreover, several Plaintiffs testified that whether they took a meal break varied depending upon their specific assignments.  Discovery Plaintiff Augustin testified that he consistently works during his meal break because he is assigned to Operations, and has to be at the desk to answer phones and respond to emails.  See Augustin Tr., Ex. BB at 61:6-64:12. However, Augustin testified that when he was assigned to LIFE Shelter and was not in Operations, whether he worked during his meal break depended upon his assigned post for the day.  *Id*. at 61:6-65:9.  Several Plaintiffs testified that if they were on an arrest or hospital detail, they typically would not take a meal break, and would often work beyond their scheduled hours. *See* Burton Tr., Ex. CC at p. 67:2-70:20; Cruz Tr., Ex. II at 84:1-19, 87:19-88:12; Dudzik Tr., Ex. T at p. 133:18-24; Francois Tr., Ex. Y at 98:4-14; 100:14-101:11; 105:24-106:4.  Discovery Plaintiff Rosario testified that once every two weeks, he was on motor vehicle operator duty and worked through his meal break.  *See* Rosario Tr., Ex. Q at 57:2-58:12, 68:13-17; 77:17-78:9.

Finally, Plaintiffs off-the-clock claims are based upon their own personal preferences and customs.  For instance, as cited *supra* in Section III.B of the Statement of Facts, Plaintiffs' testimony varied greatly with regard to the minimum amount of time worked beyond their scheduled hours for which they would request overtime.  Discovery Plaintiff Miguel Cruz testified that he would request overtime for any amount of time worked beyond his scheduled hours, while other Plaintiffs' answers as to the minimum amount of time they would request as overtime widely ranged from 10 to 90 minutes.  *See* Cruz Tr., Ex. II at 98:8-21; Seidi-Gbamuse Tr., Ex. HH at 92:7-93:13; Augustin Tr., Ex. BB at 71:22-72:19.  Therefore, based upon the

testimony of the Plaintiffs and the facts cited above, Plaintiffs' off-the-clock claims are not suitable for collective treatment because they are based upon individualized factors such as Plaintiffs' supervisors, posts and assignments, facilities, and personal customs and preferences.

> **3.      Plaintiffs' Claims are Subject to Individualized Defenses.**

Additionally, the Court should decertify the collective in this case because their off-the-clock overtime claims are subject to individualized defenses that are not common to all plaintiffs. *See Zavala*, 691 F.3d at 536-537.  In the absence of an unlawful, agency-wide policy or practice, in order to establish liability under the FLSA, Plaintiffs bear the burden of proving "that the employer had actual or constructive knowledge" of work they performed without compensation. *Kuebel,* 643 F.3d at 365.  However, Plaintiffs' testimony demonstrates that their off-the-clock claims differ greatly with regard to what defenses are available to Defendant on the issue of liability, particularly with regard to Defendant's alleged actual or constructive knowledge that Plaintiffs performed work without compensation.

For example, as cited *supra* in Point III.A of the Statement of Facts*,* some officers testified that they very rarely worked during their meal periods, and in the limited instances where they had to work during their meals due to an emergency incident, were permitted to finish the meal period once the incident was addressed.  *See* Maniotis Tr., Ex. O at 64:6-66:24; Francois Tr., Ex. Y at 98:4-99:10; Abraham Tr., Ex. M at 119:23-120:25.  However, some Plaintiffs testified that they frequently worked for part or all of their meal periods, often at the direction of Sergeants or other supervisors, and were unable to finish those meal periods.  *See* Augustin Tr., Ex. BB at 61:6-65:13; Burton Tr., Ex. CC at 89:14-19; Brackett Tr., Ex. DD at 27:6-24; 13:19-14:8; Henry Tr., Ex. FF at 29:13-30:25; 77:23-78:12.  Relatedly, several plaintiffs testified that they requested overtime for working during their meal period, and either believed they received overtime compensation, or were not sure if they received overtime

compensation.  *See* Maniotis Tr., Ex. O, at 66:25-68:15; L. Johnson Tr., Ex. GG at 50:4-52:9; C. Vasquez Tr., Ex. LL at 54:3-15.   Several plaintiffs testified that they requested overtime for working through their meal period and were denied.  *See* Burton Tr., Ex. CC at 71:21-73:10; 76:1-18; Duzik Tr., Ex. T at 135:7-136:22.   Several plaintiffs testified that they were told that they could not request overtime for working during their meal period.  *See* Cook Tr., Ex. S at 50:8-53:24; McCraw Tr., Ex. P at 145:12-146:15.   Several plaintiffs testified that they never requested overtime for working during their meal period because they never thought about doing that, or did not know that they could do that.  *See* Seidi-Gbamuse Tr., Ex. HH at 81:24-83:3; Abraham Tr., Ex. M at 98:2-99:3; Cartagena Tr., Ex. EE at 79:18-80:20.

As illustrated by these differences in testimony, all Plaintiffs are subject to individualized defenses based in part upon whether they were compensated for work performed during their meal periods, as well as whether they requested overtime compensation through CityTime.  If, upon the City's anticipated motion for summary judgment, this Court determines that there is no single, supposedly unlawful Citywide policy, Plaintiffs' off-the-clock overtime claims would depend upon whether a particular Plaintiffs' supervisor had knowledge on a particular day of that particular Plaintiff performing off-the-clock work for which he or she was not compensated. *Zivali*, 784 F. Supp. 2d at 467-468.  Because Defendant's actual or constructive knowledge is a prerequisite of liability, determining liability here requires a highly individualized factual analysis that is incompatible with collective certification.  Therefore, Plaintiffs are not similarly situated because their off-the-clock claims are subject to individualized defenses, are unsuitable for collective treatment, and require a case-by-case analysis.  For the reasons set forth above, the Court should decertify the conditionally-certified 216(b) collective.

## CONCLUSION

**WHEREFORE**, Defendant respectfully requests that this Court decertify the 216(b) collective that was conditionally certified, together with such other and further relief as the Court deems just and proper.

Dated: New York, New York
      April 15, 2019

<div style="margin-left:40%">

ZACHARY W. CARTER, Corporation Counsel of
the City of New York
Attorneys for Defendant
100 Church Street, Room 2-139/2-188
New York, New York 10007
(212) 356-2473/1105
kbowers@law.nyc.gov
jshaffer@law.nyc.gov

By:             /s/
        Kerrin A. Bowers
        J. Kevin. Shaffer
        Assistants Corporation Counsel

</div>