```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:   5/29/20
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Henry Campbell, *et al.*,

                    Plaintiffs,

      –v–

City of New York,

                    Defendant.

16-cv-8719 (AJN)

ORDER & OPINION

ALISON J. NATHAN, District Judge:

Plaintiffs are 494 current or former Officers and Sergeants in the New York City Department of Homeless Services. They bring this action against the City of New York to recover unpaid compensation under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 *et seq.* In 2017, the Court granted in part Plaintiffs' motion for conditional certification. The parties have since completed discovery, and the City now moves to decertify the collective. The Court concludes that the Plaintiffs are similarly situated as to their alleged FLSA violations. The City's motion is therefore DENIED.

## I.  BACKGROUND

### A.  Plaintiffs' Employment with the City

The New York City Department of Homeless Services (DHS) provides various services to homeless individuals, such as providing food assistance and operating shelters. DHS also operates its own force of "peace Officers," who are tasked with maintaining safety and order at the Department's facilities throughout the City. *See* Adams Dep. at 116-119; Dannenberg Dep. at 58-59; DHS Peace Officer Guide at 8. Plaintiffs in this action are 494 current or former DHS Officers and Sergeants. Among other duties, Officers patrol DHS facilities, screen employees

1

and visitors, make arrests, issue summonses, transport individuals in custody to police precincts, respond to emergency situations, and assist sick and disabled individuals.  *See* Officer Title Spec., Def. Ex. A; Officer Master T&S, Def. Ex. B.  Sergeants perform many of the same duties, such as responding to emergency situations, but are also responsible for supervising Officers. *See* Dannenberg Dep. 69-72; Sergeant Master T&S, Def. Ex. D at 2; Officer Guide, Def. Ex. E at § 107-04; OT Policy, Def. Ex. F at 3; Code of Conduct, Def. Ex. G at 14-15.

Because this case boils down to how Plaintiffs' work hours are recorded and paid out, the Court reviews the City's timekeeping system in detail.  All Officers and Sergeants are scheduled for five 8.5-hour shifts per workweek.  Adams Dep. at 187-89 (referring to these shifts as "tours").  However, the City automatically deducts 30 minutes of each employee's shift as an unpaid meal period.  Plaintiffs are therefore automatically compensated for 40 hours of work per workweek.  *See* Wright Dep. at 139-40; Adams Dep. at 73-74, 189; *accord* Def. Br. at 5 ("explaining that the unpaid half-hour meal break "results in Plaintiffs being assigned to an 8.5 hour tour but actually working [and being compensated for] a total of 8 hours during the shift.").

When an Officer or Sergeant arrives at her work location, she first "clocks in" to CityTime, the City's proprietary timekeeping system.  *See* Def. Br. at 4 ("All Plaintiffs use CityTime to record their attendance and have done so since approximately June 2010"); Pestana Dep. at 128; Wright Dep. at 26-27, 36-37.  The employee clocks in *even if* she arrives before her shift is scheduled to begin.  Employees can clock in in several ways, but the most common is by using a hand scanner.  *See* Wright Dep. at 29:17-23, 79:25-80:19.  Officers and Sergeants are then required to change into their uniforms.  Fifteen minutes after their shifts are scheduled to begin, "roll call" is held.  *See, e.g.*, Abraham Dep. at 77:15-20.  Following roll call, the employee proceeds to her assigned duties.  At some point in the day, the employee may take a thirty-

minute break for lunch.  Wright Dep. at 374:10-375:3; Officer Guide, Ex. E at § 113-02.  When she completes work for the day—which may be *after* her shift is scheduled to end—she clocks out using CityTime.

Even though CityTime may record an employee as working more than her scheduled hours, the system will only compensate Plaintiffs for scheduled hours of work and approved overtime.  In other words, "[a]ll time that's captured by CityTime is not treated as work time, [only] the time within your scheduled hours [is treated as work time]."  Pestana Dep. 120:21-121:7; *accord id.* 104-105 ("CityTime assumes that you worked your regularly scheduled hours unless the employee tells it otherwise"), 115-116, 121; Wright Dep. at 36-37; Def. Br. at 4 ("The default in the CityTime system is that Plaintiffs are compensated for all hours worked during their scheduled shift.").

Consider the example of Officer Jones.  Her shift begins at 8 AM and ends at 4:30 PM. 30 minutes of her shift will be automatically deducted from her pay, so she will generally be paid for only eight hours of work.  If Officer Jones arrives at 7:30 AM, she clocks in using CityTime. As the Court discusses below, she often then performs work-related duties and gets ready for her shift.  Her shift begins at 8 AM, and roll call is conducted at 8:15 AM.  At some point in the day, she may take a 30-minute meal break.  Her shift ends at 4:30 PM, but because her replacement arrives late, she leaves work at 5:00 PM.  She clocks out at that time and heads home.  On CityTime, therefore, Officer Jones logged 9.5 hours of work.  30 minutes of that is deducted for her meal break, leaving nine hours.  But unless she is approved for overtime pay, she is paid only for eight of those hours.

The parties dispute the exact details of how Plaintiffs receive overtime.  But the record makes clear that employees may in certain instances request overtime and that overtime requests

require two levels of approval.  *See* Wright Dep. at 184-185.  An employee's immediate supervisor is the first-level approver of overtime, and the second-level approver is often the supervisor's supervisor.  *See* Wright Dep. at 184:14-19.  For Officers, that means their Sergeant and the Sergeant's supervisor, usually a captain, must approve their overtime requests.  *Id.*

### B.  Procedural History

In November 2016, five DHS employees initiated this action.  *See* Complaint, Dkt. No. 1. Four of the named Plaintiffs are employed as Officers, and the fifth as a Sergeant.  They allege four discrete FLSA violations.  First, Plaintiffs contend that the City fails to pay them for hours routinely worked in excess of forty hours a week.  Specifically, they allege that they often work before and after shifts and during their meal breaks, rendering their total hours greater than 40 per week, but are not paid overtime for those extra hours.  The Court refers to this as Plaintiffs' off-the-clock claim.  Second, Plaintiffs allege that the City miscalculates the rate of overtime pay.  Third, Plaintiffs allege that the City miscalculates compensatory time.  And fourth, Plaintiffs allege that the City makes untimely overtime payments.  Compl. ¶¶ 30–52.

On January 19, 2017, the Plaintiffs moved to conditionally certify this case as a collective action and to send notice to putative plaintiffs.  Dkt No. 17.  The City opposed the motion.  Dkt. No. 29.  The City also moved to partially dismiss Plaintiffs' Compliant.  Dkt. No. 19.

On July 25, 2017, the Court granted in part and denied in part each of these motions.  As relevant here, the Court conditionally certified Plaintiffs' off-the-clock.  Dkt. No. 37.  On October 30, 2017, the Court approved an opt-in notice.  After the notices were sent, 484 Plaintiffs opted into this litigation.  *See, e.g.*, Dkt. No. 58.

The parties then conducted lengthy discovery, which concluded in mid-2019.  *See* Dkt. No. 106.  The City then moved to decertify the collective.  Dkt. No. 115.  That motion is now before the Court.  Because the collective was conditionally certified only as to Plaintiffs' off-the-

4

clock theory, this Opinion addresses only that claim.

## II.    LEGAL STANDARD

### A.  FLSA Claims for Unpaid Overtime

The FLSA provides that "no employer shall employ any of his employees . . . for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed."  29 U.S.C. § 207(a)(1).  As defined by the FLSA, to "employ" means to "suffer or permit to work."  *Id.* § 203(g); *see also* 29 C.F.R. § 785.11 ("Work not requested but suffered or permitted is work time.").  Thus, "[t]o establish liability under the FLSA on a claim for unpaid overtime, a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work."  *Perry v. City of New York*, No. 13-cv-01015 (VSB), 2018 WL 1474401, at *4 (S.D.N.Y. Mar. 26, 2018) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011)).

### B.  FLSA Section 216(b)

Under the FLSA, employees can create "a collective by opting-in to a backpay claim brought by a similarly situated employee."  *Glatt v. Fox Searchlight Pictures, Inc.*, 811 F.3d 528, 540 (2d Cir. 2016) (citing 29 U.S.C. § 216(b)).  Section 216(b) of the FLSA authorizes employees to maintain collective actions where they are "similarly situated" with respect to the alleged violations of the FLSA.  29 U.S.C. § 216(b); *Myers v. Hertz Corp.*, 624 F.3d 537, 555 (2d Cir. 2010).  Similarly situated employees must "opt in" to an action by filing a "consent in writing to become . . . a party."  29 U.S.C. § 216(b); *Elfoulki v. Brannons Sandwich Shop, LLC*, No. 14-cv-5964 (PKC), 2016 WL 1736203, at *2 (S.D.N.Y. May 2, 2016) ("An FLSA collective differs from a Rule 23 class because plaintiffs become members of the collective only after they

affirmatively consent to join it." (internal quotation marks omitted)).

Certification of a "collective action" is a two-step process in the Second Circuit. *See Myers*, 624 F.3d at 554–55. At the first step (conditional certification), the Court simply authorizes notice to be sent to potential similarly situated plaintiffs. *Id.* at 555. Plaintiffs bear the light burden of making a "modest factual showing" that the named initial plaintiffs and the potential opt-in plaintiffs "together were victims of a common policy or plan that violated the law." *Id.* (quoting *Hoffman v. Sbarro, Inc.*, 982 F. Supp. 249, 261 (S.D.N.Y. 1997)).

At the second step, the defendant has the opportunity to move for decertification if, after discovery, the record shows that the opt-in plaintiffs are not in fact similarly situated to the named plaintiffs. *See Myers*, 624 F.3d at 555. The Court must apply a more "stringent standard" of proof in this second stage for determining whether plaintiffs are similarly situated for the purposes of the FLSA. *See Damassia v. Duane Reade, Inc.*, No. 04-cv-8819, 2006 WL 2853971, at *3 (S.D.N.Y. Oct. 5, 2006). The Second Circuit has yet to prescribe a particular method for determining whether members of a class are similarly situated. However, district courts in this circuit typically look to the: "(1) disparate factual and employment settings of the individual plaintiffs; (2) defenses available to defendants which appear to be individual to each plaintiff; and (3) fairness and procedural considerations counseling for or against [collective action treatment]." *Zivali v. AT&T Mobility, LLC*, 784 F. Supp. 2d 456, 460 (S.D.N.Y. 2011) (internal quotation marks and citations omitted) (citing cases).

For plaintiffs to defeat a motion for decertification, "[a]ll that is required is a persuasive showing that the original and opt-in plaintiffs were common victims of a FLSA violation pursuant to a systematically-applied company policy or practice such that there exist common questions of law and fact that justify representational litigation." *Pefanis v. Westway Diner, Inc.*,

No. 08-cv-002 (DLC), 2010 WL 3564426, at *4 (S.D.N.Y. Sept. 7, 2010).  "Plaintiffs need not present evidence for each and every opt-in Plaintiff so long as they can show that Defendants engaged in a policy, plan, or scheme of FLSA violations."  *Lynch v. City of New York*, No. 16-cv-05677 (KBF), 2017 WL 4877425, at *3 (S.D.N.Y. Oct. 27, 2017) (internal citation and quotation marks omitted).  Although "the standard is higher at this second stage, the 'similarly situated' requirement of 29 U.S.C. § 216(b) is considerably less stringent than the requirement of Fed. R. Civ. P. 23(b)(3) that common questions 'predominate.'"  *Alonso v. Uncle Jack's Steakhouse, Inc*., No. 08-cv-7813 (DAB), 2011 WL 4389636, at *3 (S.D.N.Y. Sept. 21, 2011) (internal quotation marks omitted).  Plaintiffs bear the burden to prove that all class members are similarly situated.  *See Ayers v. SGS Control Servs., Inc*., No. 03-cv-9078, 2007 WL 646326, at *4 (S.D.N.Y. Feb. 26, 2007); *accord Thind v. Healthfirst Mgmt. Servs., LLC*, No. 14-cv-09539 (LGS), 2016 WL 7187627, at *2 (S.D.N.Y. Dec. 9, 2016) ("When a defendant moves for decertification, the burden is on the named plaintiff to show by a preponderance of the evidence that the opt-in plaintiffs are similarly situated." (internal citation omitted)).

If all putative class members are "similarly situated," the "conditional" aspect of certification is removed, the collective action is finally certified, and the case proceeds to trial. *See Canales v. 115 Broadway Corp*., No. 09-cv-4674, 2009 WL 3029333, at *2 (S.D.N.Y. Sept. 22, 2009).  If the Court finds all class members are not similarly situated, however, "the class is decertified, the claims of the opt-in plaintiffs are dismissed without prejudice, and the class representative may proceed on his or her own claims."  *Lee v. ABC Carpet & Home*, 236 F.R.D. 193, 197 (S.D.N.Y. 2006).

### III.  THE COLLECTIVE IS PROPERLY CERTIFIED

The Court reviews the three relevant factors in turn: (1) factual and employment-related differences among the Plaintiffs, (2) individualized defenses available to the City, and

(3) fairness and procedural considerations.  *See Zivali*, 784 F. Supp. 2d at 460.  The Court concludes that each of these factors weighs in favor of collective treatment.

### A.  The Plaintiffs Are Similarly Situated

On the first factor, Plaintiffs' burden is to make a "persuasive showing that the original and opt-in plaintiffs were common victims of a FLSA violation pursuant to a systematically-applied company policy or practice such that there exist common questions of law and fact that justify representational litigation."  *Pefanis*, 2010 WL 3564426, at *4.  In order to be amenable to class certification, Plaintiffs must allege that "the practices and culture of which they complain are sufficiently uniform and pervasive as to warrant class treatment."  *Zivali*, 784 F. Supp. 2d at 463.

### 1.  Plaintiffs Allege Identical FLSA Violations

Plaintiffs have put forward persuasive evidence that DHS Officers and Sergeants frequently perform work before their shift, after their shift, and during meal periods, but are not paid overtime for that work.  In other words, they allege that Plaintiffs have all suffered identical FLSA violations.

To start, more than a dozen employees testified to performing various forms of work before their shift began, such as speaking with other employees about work-related issues and performing administrative work.  For example, Officer Miguel Cruz testified that he sometimes arrives at work before his shift starts, "get[s] [his] radio battery, taser," receives briefings from superior Officers, and  "update[s] [his] memo book from the previous day or previous tour."  Cruz Dep. 51:7-52:3.  Other Officers provided similar testimony.  *See, e.g.*, Augustin Dep. 37:1-3 (stating that he answers phones and emails before his shift begins); Burton Dep. 50:10-11 (stating that she "get[s] dressed" and "get[s] prepared" before her shift begins).  And Sergeants likewise performed work before starting their shifts.  *See, e.g.*, Dudzik Dep. 95:18-19 (stating

that when he arrived at work before his shift, he would "get an update of what was going on" from the Sergeant whom he was replacing and "do the post assignment.").

Employees provided similar testimony about performing work after their shift ended. For example, Officers and Sergeants alike testified that they were often unable to leave work at the end of their scheduled shifts because they were held up by emergency situations, like an arrest or medical issue. *See* Brackett Dep. at 28; Mas Dep. at 79; Augustin Dep. at 80-81; Cruz Dep. at 107-108; Seidi-Gbamuse Dep. at 115-116. Plaintiffs also testified that they could be delayed leaving because their "relief," or replacement, arrives at work late. *See* Vasquez Dep. at 121-122; Seidi-Gbamuse Dep. at 74; McCraw Dep. at 134-135; Cook Dep. at 33-34; Maniotis Dep. at 38; Abraham Dep. 88; L. Johnson Dep. at 44-45, 67; Cartagena Dep. 71-73; Francois Dep. at 126; Dudzik Dep. at 62-63, 101-102, 110-111; Cruz Dep. at 75-76; Robinson Dep. at 75; Brackett Dep. at 28-29 (noting that he has waited up to five hours after the end of his shift to be relieved); Rosario Dep. at 49-50; Augustin Dep. at 57, 80.

Employees also testified about being required to work through their meal breaks. As noted, the City automatically deducts 30 minutes of Plaintiffs' time each shift for an unpaid meal break. But both Officers and Sergeants stated that they often worked during these meal breaks. They provided a host of reasons for doing so. For example, there could be emergencies like arrests or fights at the shelter that prevented them from taking a break. *See, e.g.*, Johnson Dep. at 65:19-24 ("I'm eating, I can get a call over the radio, which happened all the time. I would have to stop eating and tend to the situation and see what was happening."); *id.* at 66:6-11 (stating that "during [her] meal" and "even if [she] was eating," she would "conduct patrols" and perform other work); Seidi-Gbamuse Dep. at 37 ("like last time, I was sitting down eating, trying to eat, I took a bite and all of a sudden there's a fight, so I have to stop what I'm doing to go tend to the

fight."). Officers and Sergeants also performed administrative work during the break. *See, e.g.*, Augustin Dep. 79; Dudzik Dep. at 131-34. And Sergeants often told Officers that they could ont take a meal break. *See, e.g.*, Vasquez Dep. at 27-28; Brackett Dep. at 13-14.

Plaintiffs testified that they are not paid for most of this work—even though the City was aware, through CityTime, that they worked these hours. And the City has not put forward any persuasive rebuttal evidence. This custom or practice may well violate the FLSA. *See generally Holzapfel v. Town of Newburgh*, 145 F.3d 516, 524 (2d Cir. 1998) ("[O]nce an employer knows or has reason to know that an employee is working overtime, it cannot deny compensation even where the employee fails to claim overtime hours."). The Court therefore concludes that Plaintiffs have met their burden to show that the opt-in plaintiffs were *common victims* of a FLSA violation "pursuant to a systematically-applied company policy or practice." *See Pefanis*, 2010 WL 3564426, at *4. There are therefore common questions of fact and law among the Plaintiffs, and the Plaintiffs are similarly situated.

### 2. The City Focuses on Differences That Are Not Relevant to the FLSA Claims

The City attempts to defeat this similarity, however, by harping on a slew of distinctions among the Plaintiffs. None of these distinctions, however, situates any of the Plaintiffs differently as to their shared FLSA claims.

The City relies upon several purported differences: First, the City points out that most of the Plaintiffs have different supervisors. And because these myriad supervisors have different approaches to overtime, says the City, certification is not appropriate. Second, the City details at length the different responsibilities of Officers and Sergeants. *See* Def. Br. at 17–19. For example, Sergeants conduct daily roll call sessions, maintain various DHS records, and communicate with higher-ranking officials. *See, e.g.*, Abraham Dep. at 119:23-120:25; McCraw

10

Dep. at 171:3-8.  And Sergeants manage Officers in several respects, including evaluating their

job performance, disciplining them, and at times telling them when they may take meal breaks.

*See* Sergeant Title Spec., Def. Ex. C.  Relatedly, the City notes that some of the Sergeant-

Plaintiffs supervise some of the Officer-Plaintiffs.  Third, the City points to a host of other

"individualized factors" regrading Plaintiffs' claims, such as their posts and assignments,

facilities, and personal preferences.  Def. Br. 20–24.  All in all, the City contends that these

differences render Plaintiffs ill-suited for collective treatment.

      These arguments miss the mark for the same reason: they have little to do with the

alleged FLSA violation here.  Plaintiffs argue—and have demonstrated for purposes of this

motion—that the City has a *custom or practice* requiring them to perform work before and after

shifts and during meals without compensation.  As the Court explained in its earlier opinion, "the

certification question is not whether the [plaintiffs] are similarly situated in all factual respects,

but rather whether they 'are similarly situated *with respect to their allegations that the law has

been violated*.'"  Dkt. No. 37 at 16 (quoting *Kassman v. KPMG LLP*, No. 11-cv-3743 (LGS),

2014 WL 3298884, at *7 (S.D.N.Y. July 8, 2014)); *accord Amador v. Morgan Stanley & Co.

LLC*, No. 11-cv-4326 (RJS), 2013 WL 494020, at *5 (S.D.N.Y. Feb. 7, 2013) ("The fact that the

employees held different positions at different locations does not prevent conditional

certification.  Courts have found employees 'similarly situated' for purposes of the FLSA where

they performed different job functions or worked at different locations, as long as they were

subject to the same allegedly unlawful policy." (internal quotation marks omitted)).

      None of the distinctions the City put forward relate to their off-the-clock claims.  For

example, Plaintiffs' theory of liability does not turn on the practices of individual managers.  As

another court explained in similar circumstances, "[i]f Plaintiffs were to ultimately succeed on

this theory, they would not need to prove that each Plaintiff's supervisor had actual or constructive knowledge of the pre- and post-shift work." *Perry v. City of New York*. No. 13-cv-1015 (VSB), 2019 WL 1146581 (S.D.N.Y. Mar. 13, 2019); *see also Briceno v. USI Servs. Grp., Inc.*, No. 09-cv-4252 (PKC), 2015 WL 5719727, at *10 (E.D.N.Y. Sept. 29, 2015) (finding that, where plaintiffs had "shown that Defendants had a company-wide practice" requiring off-the-clock work, they did not need to "demonstrate that each manager had knowledge that employees were performing off-the-clock work without being compensated"); *cf. Zivali*, 784 F. Supp. 2d at 468 ("In the absence of a company-wide policy or practice, plaintiffs will have to demonstrate that each individual manager had actual or constructive knowledge that plaintiffs were performing off-the-clock work without proper compensation."). This theory also does not turn on the differences in responsibilities between Officers and Sergeants. The precise work performed during the overtime hours, or whether it involved one Plaintiff disciplining another, does not matter. The same is true for the location of work and the various individual preferences put forward by the City.

To understand why these distinctions are immaterial, it is helpful to review two analogous cases. The first is *Perry v. City of New York*, in which current and former FDNY emergency medical technicians, paramedics, and fire safety inspectors sued the City for FLSA violations. No. 13-cv-1015 (VSB), 2019 WL 1146581 (S.D.N.Y. Mar. 13, 2019). The relevant claim was almost identical to the one here: plaintiffs alleged that they were not compensated for work before and after their shifts. Plaintiffs put forward a slew of testimony from employees stating that they performed uncompensated work. Just as here, "when EMTs/Paramedics arrive[d] at worksites, they immediately sign[ed] in using the 'CityTime' system." *Id.* at *1. They then performed work "before their regularly scheduled shifts [began] . . . such as checking

and preparing equipment, and after their regularly scheduled shifts have ended, . . . such as exchanging equipment and/or narcotics." *Id.* at *2. This additional time was recorded in CityTime, but the employees were compensated only for the time worked during their assigned shifts. And just as here, the City argued that certification was inappropriate because these employees performed different roles, had different supervisors, and worked in different locations.

The court concluded that these groups were similarly situated and could proceed as a collective. It noted that because Plaintiffs had alleged and demonstrated, at that stage, a "policy or practice requiring all Plaintiffs to perform pre- and post-shift work without compensation," they would "not need to prove that each Plaintiff's supervisor had actual or constructive knowledge of the pre- and post-shift work." *Id.* at *5. This obviated much of the City's focus on granular distinctions between the plaintiffs, such as their specific supervisor or location of work. The court further held that, despite the differences among the employees, plaintiffs had put forward sufficient evidence "to establish the basis for a persuasive showing that Defendants' unwritten policies and practices require EMTs/Paramedics to work after their shift has ended, that Defendants are aware that this work is routinely performed, and that they do not routinely provide—and may not even permit—overtime compensation for that work." *Id.* at *6. The court explained that "Plaintiffs need show only that their positions are similar, not identical," and that "courts have often found opt-in plaintiffs similarly situated in large off-the-clock cases despite the individualized issues such cases present." *Id.* at *7 (internal quotation marks omitted).

The same is true here. To be sure, there are differences among Plaintiffs. But plaintiffs in any collective action will vary across a host of dimensions; defendants cannot defeat certification by pointing to any difference. *See Ayers v. SHS Control Servs., Inc.*, No. 03-cv-

9077 (RMB), 2007 WL 646326, at *4 (S.D.N.Y. Feb. 27, 2007); *McGlone*, 49 F. Supp. 3d at

367; *Barry v. S.E.B. Serv. of New York*, Inc., No. 11-cv-5089 (SLT), 2013 WL 6150718, at *6

(E.D.N.Y. Nov. 22, 2013).  Instead, the relevant inquiry is whether the Plaintiffs are similarly

situated as to their specific FLSA violation—and here, they are.  S*ee also see Torres v.*

*Gristede's Operating Corp.*, No. 04-cv-3316 (PAC), 2006 WL 2819730, at *11 (S.D.N.Y. Sept.

29, 2006) (granting motion for FLSA collective action where claims required an inquiry "based

on policy, practice, and conduct").

  In an even more similar case, Magistrate Judge Aaron considered off-the-clock claims by

another set of City employees, fraud investigators in the City's Human Resources

Administration.  *Adams v. City of New York*, No. 16-cv-03445 (RA) (SDA), 2019 WL 5722054,

at *6 (S.D.N.Y. Aug. 29, 2019), *report and recommendation adopted*, 2020 WL 1031025

(S.D.N.Y. Mar. 3, 2020).  Those employees alleged essentially the same allegations as Plaintiffs

here: "the City failed to compensate Plaintiffs for work that they were suffered or permitted to

work 'off-the-clock;' namely, before the official start time of their shifts, during their

uncompensated meal periods and after the official end time of their shifts."  *Id.* at *5.  The City

attempted to decertify the collective with virtually *identical* arguments as it employs in this

action.  *See id.* at *6 ("The City contends that Plaintiffs' off-the-clock claims are unsuitable for

collective treatment because: (1) [one set of employees] [is] not similarly-situated to [another]

because some [of the former] supervise [the latter]; (2) they are based on individualized factors

and circumstances such as work location, supervisor, work assignments and personal

preferences; and (3) they are subject to individualized defenses.").

  Judge Aaron recommended that the collective remain certified.  The court first

considered the City's argument that the two groups were "not similarly situated" because "[their]

14

job responsibilities" were "materially different." *Id.* It rejected this contention, explaining "these arguments appear to be premised on the City's theory that the alleged FLSA violations resulted, if at all, from the actions of individual supervisors rather than from a common policy or practice." *Id.* But the court made clear that "[a]n individualized inquiry into each supervisor's knowledge regarding their subordinates' pre-shift, post-shift and meal period work only will be required if Plaintiffs fail to establish that the City had a common policy of not paying overtime that was not pre-approved even though the City was aware of it." *Id.* at *6. And the court explained that "for FLSA claims based on a common policy or practice, courts routinely find that plaintiffs are similarly situated despite individualized issues such as those raised by the City here." *Id.* at *7 (citing *Perez*, 2016 WL 5719802, at *5 (denying decertification where plaintiffs alleged violations based on common policy)) and *Perry*, 2019 WL 1146581, at *7. The court also rejected the City's argument about "differences in Plaintiffs' individual habits relating to meal time and pre-shift and post-shift work." *Adams*, at *7. It explained "the issue here is whether the City's policies are subject to generalized proof . . . at this stage of the litigation, Plaintiffs have made a persuasive showing that they performed pre-shift, post-shift and/or meal period work that was recorded in CityTime, but, pursuant to the City's policies and practices, was not compensated." *Id.* The Court comes to the same conclusion here. In short, the City's litany of arguments "do not render the Plaintiffs dissimilar for purposes of their off-the-clock claims." *Id.*

### 3. The City's Remaining Arguments Fail

The City proffers various other arguments against similarity. To start, it argues that CityTime—the time-monitoring system itself—is "a lawful timekeeping practice." Def. Reply Br. at 3. To be sure, the FLSA "does not prescribe any particular form of recordkeeping," employers have broad discretion to create their own systems, and courts have routinely upheld

such methods of timekeeping.  *See Zivali*, 784 F.Supp.2d at 461.  But the City's argument is a red herring—Plaintiffs do not challenge CityTime's legality.  Instead, they argue that the City knows about their uncompensated overtime because they record their clock-in and clock-out times in CityTime.  The City advanced the same, misguided argument in *Perry*, arguing that because "the CityTime timekeeping system is legal, and therefore it cannot be the basis for a finding that Plaintiffs are similarly situated."  *Perry*, 2019 WL 114581 at *5.  There too, the court held that this "argument misses the mark because . . . Plaintiffs do not challenge the use of CityTime as a per se unlawful timekeeping system under the FLSA.  Rather, they claim that Defendants' policy or practice of not compensating Plaintiffs for required pre- and post-shift work that is recorded by CityTime is a violation of the FLSA."  *Id.*

The parties also spend substantial energy arguing about two specific nuances of the City's policies.  Plaintiffs argue that they can request overtime only if they work more than one cumulative hour of overtime.  Because they often work overtime in smaller increments, Plaintiffs say this leads to drastic under-compensation.  Second, Plaintiffs argue that all overtime must be preapproved.  They claim this policy often leaves many Plaintiffs in a Catch-22—they do not know whether they will have to work overtime until an emergency occurs, and at that point it is too late to seek pre-approval.  In support of their claim that the City uses these twin policies, Plaintiffs cite testimony from one of the City's Rule 30(b)(6) witnesses, Jennifer Wright.  The City denies that either of these policies exist, and cites different portions of Wright's testimony and that of another 30(b)(6) witness, Georgia Pestana, to support its position.  There is cross-cutting evidence on these points.  But the Court need not decide at this juncture whether Plaintiffs have proved the existence these policies beyond a preponderance of the evidence.  That is a question for the factfinder.  For purposes of this motion to decertify, it is sufficient that

16

Plaintiffs have shown that the City has a custom or practice of under-compensating DHS Officers and Sergeants who work before and after shifts and during meals. This finding, for purposes of this motion, creates common questions of law and fact sufficient to justify certification.

### B.  The City's Defenses Are Susceptible to Collective Treatment

The Court next considers whether the City's defenses are individualized or capable of collective treatment. The City argues that its defenses are individualized because "[i]n the absence of an unlawful, agency-wide policy or practice, in order to establish liability under the FLSA, Plaintiffs bear the burden of proving 'that the employer had actual or constructive knowledge' of work they performed without compensation." Def. Br. at 24 (quoting *Kuebel*, 643 F.3d at 365). As discussed, however, Plaintiffs have demonstrated such a practice and thus do not need to prove each supervisor's individualized knowledge. *See, e.g.*, *Perry*, 2019 WL 114581 at *8 ("Plaintiffs need only prove each supervisor's knowledge of the uncompensated work if they fail to prove at trial that they were subject to a policy and or practice that required the pre- and post-shift work for which they were not compensated, or if they fail to prove that CityTime accurately records compensable pre- and post-shift work."). As the Court explained in *Perry*, "if the individual defenses become relevant," it may "bifurcate trial or draft jury instructions suitable to incorporate them." *Id.* (citing *Torres*, 2006 WL 2819730, at *11 n.10 ("Even if defendants were to raise highly individualized defenses, the Court may grant collective action and bifurcate trial, as necessary, to address those defenses.") (internal quotation marks omitted))).

### C.  Fairness and Procedural Considerations Also Support Collective Treatment

The Court lastly considers fairness and procedural considerations. When reviewing this final factor, "courts consider whether a collective action would lower costs to the plaintiffs

through the pooling of resources, efficiently resolve common issues of law and fact, and coherently manage the class in a manner that will not prejudice any party." *Ayers*, 2007 WL 646326, at *6.

Because the almost 500 Plaintiffs in this action are similarly situated, the costs of a collective action will surely be lower than individual trials, which would result in duplicative evidence and legal arguments. Indeed, Plaintiffs' off-the-clock claims raise many common issues of fact and law. Proceeding as a collective, therefore, is fair to the employees and helpful for purposes of judicial economy. Other cases have likewise found that these sorts of claims are best resolved through representative litigation. *See, e.g.*, *Perry*, 2019 WL 1146581 at *8 ("permitting the EMTs/Paramedics to proceed in a collective action will allow this court to efficiently resolve the common questions of whether Defendants' policies or practices require EMTs/Paramedics to perform pre- and post-shift work, whether CityTime accurately records pre- and post-shift work, and, if so, whether Defendants systematically fail to compensate EMTs/Paramedics for that work."). In short, "[b]ecause common questions predominate and individual issues may be resolved separately," the Court concludes that the "policy objectives of reducing cost and increasing efficiency are best furthered by granting collective action." *Ayers*, 2007 WL 646326, at *6. (internal quotation marks omitted).

## IV.    CONCLUSION

For the reasons stated above, the City's motion to decertify the collective is DENIED. This resolves Dkt. No. 115.

No later than two weeks from the date of this Order, the parties shall file a joint letter, indicating whether either side intends to move for summary judgment and, if so, submitting a proposed briefing schedule for such a motion. The letter must further indicate the status of settlement discussions in this matter and whether the parties would like a referral to the

Magistrate Judge or to the Court-annexed Mediation Program for purposes of settlement.

       SO ORDERED.

Dated: May 29, 2020
      New York, New York

_____
            ALISON J. NATHAN
          United States District Judge